J-S23021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DANTE SALLEY | : | |
| | : | |
| Appellant | : | No. 432 EDA 2023 |

Appeal from the Judgment of Sentence Entered September 19, 2022
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0002120-2020

BEFORE:   STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                     **FILED JULY 23, 2024**

Appellant, Dante Salley, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his jury trial convictions for robbery, conspiracy, theft by unlawful taking, and criminal use of a communication facility.[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> Just after 7:00 p.m. on Friday, October 25, 2019, a woman dressed in a purple and black hijab and Muslim attire exited a blue Mercury Mountaineer SUV with after-market rims on Cheltenham Avenue, walked across a parking lot, and entered the CVS Store at 45 Cheltenham Avenue in Cheltenham Township, Montgomery County.  For approximately [one hour and forty] minutes, this woman

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 903, 3921(a), and 7512(a), respectively.

walked around inside, as well as in and out, of the store, asking questions of the [19-year-old] cashier, Ayonne Sledge, and the [20-year-old] supervisor, Zakiya Nubutare. When she was not speaking directly with the two CVS employees, the woman was on her cell phone. During this time, the Mercury Mountaineer circled the blocks around the CVS Store approximately three (3) or four (4) times, stopping occasionally in various store parking lots in the shopping center before continuing to circle.

At around 8:40 p.m., the woman in the Muslim attire walked out of the store for the last time and, shortly thereafter, Ms. Nubutare went outside to close the gate in front of the store and start the store closing process. When Ms. Nubutare re-entered the store, she saw another person dressed in a female Muslim headdress and attire inside. Thinking this was a frequent customer, she asked how she could assist the person. Ms. Nubutare then realized that it was not the regular customer but, rather, a black male, strong, husky, over 200 pounds, and approximately [six] feet tall. He motioned as if he had a gun and told her to take him to the office and to give them the money. Ms. Sledge believed the man had a weapon and she was afraid.

Ms. Nubutare led that first man up the stairs to the office and the store safe, as he had instructed. She also believed the man could have a gun on him. The second man walked in shortly after the first, and Ms. Sledge and Ms. Nubutare described him as a black male, approximately 5' 9", shorter than suspect number 1, and wearing a gray hoodie tied up to his nose and covering his face. Ms. Sledge explained that suspect number 2 walked right up to them, like he knew why he was there and what to do. Ms. Nubutare noticed the second man when he appeared in the office with a bag and both men instructed her to put everything in the bag. At one point after Ms. Nubutare had opened the door to the office, she felt something pointed up against her mid-lower back that did not feel like a gun or a finger, but she believed that she and other co-workers in the store were at risk or in danger. After Ms. Nubutare finished loading the bag with the cash from the safe, the men told her to count to 50 and not to call the police as they were leaving. The CVS employees quickly called the police, and an officer arrived within five (5) minutes. Neither woman was able to get a

good look at the men's faces, as only their eyes, part of their nose, and some skin around their eyes were visible because of their clothing.

After receiving a report of an armed robbery, Patrol Officer Timothy Filoon of the Cheltenham Township Police Department arrived at the CVS Store at around 8:50 p.m. on October 25, 2019, and was met by two female employees who were visibly shaken, and a male pharmacist. In speaking with the employees, Officer Filoon learned that the two men had taken approximately $3,304 in cash and that there was store surveillance video. Officer Filoon proceeded to the CVS Store office and reviewed the video off of the security surveillance system. While reviewing the video, Officer Filoon simultaneously radioed through Montgomery County Dispatch to give other officers a description of the two…men and what they were wearing. The Officer described the first suspect as a black male, unknown age, approximately 5 feet, 10 inches to 6 feet tall, medium to larger build and wearing a Muslim-style head covering that covered all but his eyes, and a long black Muslim-style dress that went to his ankles, a green, long cardigan that went to his knees, and white, Nike sneakers. Officer Filoon described the second suspect as a black male, unknown age, approximately 5' 8" to 5' 9" in height, medium build, slightly smaller than suspect number one and wearing a gray-and-black hooded sweatshirt with black drawstrings and a Batman logo. This second suspect had pulled the hood over his face really tight, with a black cap rim sticking out from under the hood. His hands were covered for the most part with the sweatshirt sleeves and he was wearing light-colored pants and dark boots or shoes.

While reviewing the surveillance video of inside the CVS Store office, Officer Filoon could see that, among other things, suspect number 1 in the Muslim attire had a greeting card in his hand. Officer Filoon also contacted others, including the property manager, to inquire about the potential of other surveillance video of the outside from other stores in the shopping center. Officer Filoon learned not only that other stores should have video but also that a GPS tracking device was in the cash taken from the CVS by the suspects, and that the device was active and tracking into Philadelphia. The Officer learned that the device

- 3 -

tracked to the 5600 block of Appletree Street in Philadelphia and that uniformed Philadelphia police officers had responded to that location when the tracker stopped moving. Officer Filoon then drove to the 5600 block of Appletree Street to focus his attention on a blue Mercury Mountaineer SUV with after-market rims.

Philadelphia Police Officer Terrelle Greene and his partner received the information that the GPS tracker was pinging around 5643 and 5645 Appletree Street. Upon arrival at around 9:50 p.m., Officer Greene got out of his unmarked police vehicle and, while walking down the street, placed his hand on the hood of each car that was parked on the block. The Officer found only two…vehicles that were still warm to the touch. The first was occupied by a man in a FedEx uniform who had just returned home from work. The second was the blue Mercury Mountaineer. Officer Greene, and other Philadelphia police officers, watched the vehicle for a couple of hours and spoke with anyone they encountered on the street or on their porch to try to identify its owner, to no avail. Eventually, Officer Greene received the flash information sent by Officer Filoon regarding the clothing the two…robbers were wearing. Using his flashlight to look inside the Mountaineer, Officer Greene saw the distinctive Batman hooded sweatshirt.

Once Officer Filoon arrived on Appletree Street at approximately 3:00 a.m. on October 26, 2019, he took photographs of the street and the Mountaineer parked in front of a rowhouse at 5658 Appletree Street. After shining a flashlight into the vehicle, the Officer could see several items that were very similar to items he saw on the surveillance video at the CVS Store. These items included a gray and black hooded sweatshirt with black drawstrings and a Batman logo, a pair of white Nike sneakers, a pair of dark boots or shoes, a black Adidas baseball-style cap, black fabric that appeared consistent with a Muslim style dress, and the corner of a greeting card. Officer Filoon escorted the vehicle being transported by Flourtown Sunoco Towing from Appletree Street to the Cheltenham Township Police Impound lot.

Detective Matthew Gonglik applied for a search warrant for the Mercury Mountaineer on Tuesday, October 29, 2019. On

- 4 -

November 22, 2019, Detective Gonglik filed an application under the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("Wiretap Act") for disclosure of records concerning electronic communication service related to a cellular "tower dump"[2] of the closest cell towers servicing the vicinity of the armed robbery. In this application (the "Tower Dump Application"), Detective Gonglik included an exhibit which contained many of the same averments which were included in the affidavit of probable cause attached to the search warrant application for the Mercury Mountaineer. Detective Gonglik averred in the Tower Dump Application that video surveillance of the robbery revealed that one of the alleged co-conspirators was using a cellular telephone immediately before the robbery. Additionally, Detective Gonglik explained that based on his training and experience, he is aware that criminals use cellular telephones in furtherance of their illicit activity, including using cellular telephone communications to plan, execute and flee from their crimes. The Detective further averred that cell tower dump records are tower specific and will show every cellular telephone number which a particular tower used to process the calls and the existence of one of the robbery suspects' or co-conspirators' cell phone numbers may be discovered in these records.

After reviewing the application, the [trial court] issued an Order on November 22, 2019, stating "the place to be searched was the records of the cell phone companies which utilize the applicable cell towers and the order clearly identified the items to be seized: historical CSLI[3] data

---

[2] A "tower dump" is "a download of information on all the devices that connected to a particular cell site during a particular interval." **Carpenter v. United States**, 585 U.S. 296, 316, 138 S.Ct. 2206, 2220, 201 L.Ed.2d 507 (2018).

[3] CSLI is cell-site location information, which is information collected and stored by wireless carriers when a user's cell phone connects to a specific radio antenna, or cell site. **Commonwealth v. Kurtz**, 294 A.3d 509, 529-30 (Pa.Super. 2023), *appeal granted*, ___ Pa. ___, 306 A.3d 1287 (2023) (citing **Carpenter, supra**). Real time CSLI is "obtained when the wireless service provider sends a command signal to the targeted cell phone to activate the
*(Footnote Continued Next Page)*

processed through any of the cell towers providing coverage in the area of 45 Cheltenham Avenue, Cheltenham, PA for the time period on October 25, 2019 from 6:50 p.m. to 9:00 p.m. and a comprehensive record of any and all cellular calls that were processed through those cellular towers/antennas, including all sectors, for Friday, October 25, 2019 from 6:50 p.m. to and including 9:00 p.m."

Cheltenham Township Police Department officers worked diligently with the Pennsylvania State Police and the Montgomery County Detective Bureau to investigate this robbery. Fingerprint and DNA analysis tied Appellant and co-defendant Torrey Thompson to the Mercury Mountaineer as well as to various objects inside of the vehicle. Once law enforcement identified one of the fingerprints as belonging to co-defendant Thompson, officers learned Thompson's address was 5645 Appletree Street, less than one hundred…feet across the street from where the Mountaineer was found parked approximately an hour after the robbery. In addition to the CVS Store GPS tracker detailing the route the vehicle containing the cash took from the Store to the 5600 block of Appletree Street in West Philadelphia, subsequent cell phone and tower analysis placed cell phones owned or utilized by the two co-defendants in the vicinity of the CVS Store before the robbery. Law enforcement officers were also able to link phone calls made during this time between Thompson's cell phone and the female in Muslim attire inside of the CVS Store leading up to the robbery.

On December 20, 2019, Detective Gonglik applied for a search warrant with respect to any and all records related to Appellant's cell phone number ending in 3225. In his application, the detective included all of the information contained within the October 29, 2019 warrant and also listed information regarding fingerprints authorities lifted from the Mercury Mountaineer. The detective averred that analysis of these fingerprints indicated they belonged to

_____

phone's location subsystem and then provides the current location of the phone to law enforcement, [whereas] historical CSLI is automatically generated and routinely collected by wireless service providers each time a cell phone connects to a cell tower." ***Commonwealth v. Pacheco***, ___ Pa. ___, ___, 263 A.3d 626, 635 n.9 (2021).

- 6 -

Appellant and this subsequently led authorities to discover Appellant was on parole in Virginia. The detective explained that the parole officer provided authorities with Appellant's cell phone number ending in 3225. Detective Gonglik also averred that the information obtained as a result of the Tower Dump Application indicated that Appellant's cell phone number was one of the phones utilizing a cell tower in the vicinity of the robbery at the time the robbery occurred.

[The Commonwealth] filed a notice of joinder to consolidate the criminal charges in Appellant's case and co-defendant Thompson's case for a joint trial. The Commonwealth contended that co-defendant Thompson had dressed in the Muslim garb and entered the Store as suspect number 1, and Appellant had dressed in the Batman hoodie and entered the Store as suspect number 2.

(Trial Court Opinion, filed 6/20/23, at 1-10) (internal citations and quotation marks omitted).

Appellant and co-defendant Thompson filed several motions to suppress the evidence, including the application for the cell tower data. Following a hearing, on May 12, 2022, the trial court denied Appellant's motion to suppress in its entirety and issued findings of fact and conclusions of law. Initially, the trial court found that Appellant did not have a reasonable expectation of privacy in the tower dump. (*See* Findings of Fact and Conclusions of Law, 5/12/22, at 10-11). Further, the trial court found that the application satisfied the warrant requirements, as it was issued by a neutral magistrate, supported by probable cause, and described with particularity. (*See id.*)

On May 31, 2022, the case proceeded to trial. On June 3, 2022, the

jury convicted Appellant of the aforementioned crimes. On September 19, 2022, the court sentenced Appellant to an aggregate sentence of eight to sixteen years' incarceration. On September 28, 2022, Appellant filed a timely post-sentence motion seeking reconsideration of his sentence, which the court denied on January 17, 2023. On February 14, 2023, Appellant filed a timely notice of appeal. On February 15, 2023, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and Appellant timely complied on March 7, 2023.

Appellant raises a single issue for our review:

> I. Did the [trial] court err in denying [Appellant's] motion to suppress evidence recovered pursuant to a court order for a "tower dump" where the search authorized by the order was unconstitutionally overbroad in violation of the 4th amendment of the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution in that it authorized the search of call data related to thousands of individuals with no nexus to the crime?

(Appellant's Brief at 3).

Appellant argues that the court erred in denying his suppression motion because the "tower dump" was overbroad and constitutionally infirm. Appellant suggests that, pursuant to *Carpenter, supra*, he has a legitimate expectation of privacy in the record of his physical movements through CSLI. Appellant asserts that although police possessed probable cause that three people were involved in the robbery in question, the order authorizing the tower dump covered a densely populated area and permitted the Commonwealth to obtain the constitutionally protected cell tower data of

thousands of cell phone users who had no connection to the crime.[4]

Additionally, Appellant claims that he was prejudiced by the introduction of this evidence since none of the remaining circumstantial evidence placed Appellant at the scene of the robbery. Appellant concludes that the Commonwealth conducted an illegal search by conducting the tower dump, and this Court must grant relief.[5] We disagree.

_____

[4] Appellant has failed to meaningfully develop this portion of his argument regarding the data of other cell phone users such that this claim is arguably waived. *See, e.g., Commonwealth v. Armolt*, ___ Pa. ___, ___, 294 A.3d 364, 377-79 (2023) (noting where appellate brief fails to provide any discussion of claim with citation to relevant authority or fails to develop issue in any other meaningful fashion capable of review, that claim is waived; appellate court is not required to make appellant's arguments for him). *See also* Pa.R.A.P. 2119(a).

[5] Although the Commonwealth argues that Appellant waived his issue on appeal for failure to preserve it, we disagree with the Commonwealth's position. This Court has explained:

> [Pennsylvania Rule of Criminal Procedure] 581(D) provides that motions for the suppression of evidence must "state specifically and with particularity the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." Pa.R.Crim.P. 581(D). "In the extreme case, a complete failure to comply with the specificity requirements of Rule 581(D) will result in waiver, as those requirements have been held to be mandatory." *Commonwealth v. Dixon*, 997 A.2d 368, 376 (Pa.Super. 2010) (*en banc*).

*Commonwealth v. Young*, 287 A.3d 907, 916 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 303 A.3d 110 (2023).

Here, Appellant's suppression motion identified the data from the tower dump as the evidence he wished to suppress. Additionally, Appellant's supplemental
*(Footnote Continued Next Page)*

The following principles govern our review of an order denying a motion to suppress:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Ford*, 175 A.3d 985, 989 (Pa.Super. 2017), *appeal denied*, 647 Pa. 522, 190 A.3d 580 (2018).

Both the United States Constitution and the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Pa. Const. art. 1, § 8. These constitutional protections require

---

motion to suppress argued that pursuant to *Carpenter*, the CSLI evidence should have been obtained by a warrant, not court order, and that further evidence obtained by the search warrant was the fruit of the poisonous tree. At the suppression hearing, Appellant also argued that the tower dump was a violation of the privacy and liberty interests of other private individuals. (*See* N.T. Suppression Hearing, 5/2/22, at 39-41). Under these circumstances, we decline to find waiver for a lack of specificity in Appellant's suppression motion. *See Young, supra*.

that warrants "(1) describe the place to be searched and the items to be seized with specificity and (2) be supported by probable cause to believe that the items sought will provide evidence of a crime." ***Commonwealth v. Johnson***, 662 Pa. 691, 706, 240 A.3d 575, 584 (2020).[6]

An overbroad warrant is "unconstitutional because it authorizes a general search and seizure." ***Young, supra*** at 919-20. Therefore, while an overbreadth analysis "begins with an assessment of probable cause," we must also examine whether the warrant described the place to be searched and item seized with sufficient specificity. ***See Commonwealth v. Green***, ___ Pa. ___, ___, 265 A.3d 541, 549 (2021). The Pennsylvania Constitution requires that the warrant describe the items seized "as nearly as may be," a more stringent requirement than that of the Fourth Amendment, which "nearly requires particularity in the description." ***Commonwealth v. Ani***, 293 A.3d 704, 715-16 (Pa.Super. 2023).

Our Pennsylvania Supreme Court has outlined the relevant legal standards for an overbreadth challenge:

> [F]or particularity purposes, we have clarified that although some courts have treated overbreadth and ambiguity as relating to distinct defects in a warrant, both doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those

---

[6] Although the information in this case was obtained pursuant to an order issued under the Wiretap Act, the Pennsylvania Supreme Court has previously held that such orders are warrants for purposes of the Fourth Amendment, where they are issued by a neutral magistrate, demonstrate probable cause to believe the evidence sought will aid in a conviction, and particularly describe the things to be seized. ***See Pacheco, supra*** at ___, 263 A.3d at 648-49.

items for which there is probable cause. For that reason, when assessing the validity of the description contained in a warrant, the natural starting point for a court is to determine for what items probable cause existed. The sufficiency of the description [in the warrant] must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause [to search] and the description in the warrant requires suppression. This is because [a]n unreasonable discrepancy reveals that the description was not as specific as reasonably possible[,] meaning the warrant is overbroad, ambiguous, or perhaps both.

At the same time, we have also recognized the fact-dependent nature of such claims, and cautioned that search warrants should be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice. In that vein, we have held that where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item he is seeking.

***Johnson, supra*** at 706-08, 240 A.3d at 584-85 (internal citations and quotations omitted).

Significantly, "[a] defendant moving to suppress evidence has the preliminary burden of establishing standing and a legitimate expectation of privacy." ***Commonwealth v. Maldonado***, 14 A.3d 907, 910 (Pa.Super. 2011) (quoting ***Commonwealth v. Burton***, 973 A.2d 428, 435 (Pa.Super. 2009) (*en banc*)).

Standing requires a defendant to demonstrate one of the following: (1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence improperly seized; (3) that the offense charged

- 12 -

includes as an essential element the element of possession; or (4) a proprietary or possessory interest in the searched premises. A defendant must separately establish a legitimate expectation of privacy in the area searched or thing seized. Whether defendant has a legitimate expectation of privacy is a component of the merits analysis of the suppression motion. The determination whether defendant has met this burden is made upon evaluation of the evidence presented by the Commonwealth and the defendant.

*Id.*

In *Carpenter, supra*, the United States Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Carpenter, supra* at 310, 138 S.Ct. at 2217. In so holding, the Court explained that citizens have a reasonable expectation of privacy in the whole of their physical movements, and society's expectation has been "that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Id.* To allow access to cell-site records would contravene that expectation, particularly where citizens carry cell phones with them everywhere, including into private places. *See id.* Having concluded that the defendant had a reasonable expectation of privacy, the Court further held that law enforcement officials violated the defendant's Fourth Amendment rights by obtaining historical CSLI from a third-party carrier without first obtaining a search warrant supported by probable cause. *Id.* at 316, 138 S.Ct. at 2221.

In **Pacheco, supra**, our Supreme Court extended the holding in **Carpenter** regarding the collection of historical CSLI to Pennsylvania's Wiretap Act and concluded that the defendant had a legitimate expectation of privacy in his real-time CSLI. **See Pacheco, supra** at \_\_\_, 263 A.3d at 641. In so holding, the Court explained that continual real-time CSLI provides an "intimate window" into a defendant's personal endeavors and "a wealth of information about his patterns of activity, associations with other individuals, and the privacies of his daily life." **See id.** at \_\_\_, 263 A.3d at 640-41. Such "near perfect surveillance" of a defendant's location over time did not exist prior to the cell phone age, and it is unreasonable for society to "expect that law enforcement may secretly manipulate our cell phones to compel the device to reveal our physical movements over a period of time." **Id.** at \_\_\_, 263 A.3d at 641. Thus, the **Pacheco** Court concluded that a defendant retains a legitimate expectation of privacy in his real-time CSLI and applied the **Carpenter** rationale requiring a warrant to access such information for exclusively criminal investigative purposes. **Id.**

Recently, in **Kurtz, supra**,[7] this Court considered whether a defendant had a legitimate expectation of privacy concerning information produced

---

[7] Although our Supreme Court granted allowance of appeal in **Kurtz**, it has not yet issued a decision. Thus, this Court's disposition in **Kurtz** remains binding precedent. **See Marks v. Nationwide Ins. Co.**, 762 A.2d 1098 (Pa.Super. 2000), *appeal denied*, 567 Pa. 751, 788 A.2d 381 (2001) (noting that despite Supreme Court's grant of allowance of appeal, decision by this Court remains binding precedent unless and until it is overturned by Supreme Court).

through a tower dump request to a cellular service provider. The **Kurtz** Court distinguished CSLI and the data obtained through tower dumps: notably, tower dumps did not allow the government to track the defendant's precise location and follow him continuously without detection. Rather, this data enabled police to identify phones that had been near the location of the crime at specific times. Thus, the tower dumps were less a tool for "tracking" suspects and "more akin to the conventional surveillance technique of security cameras, capturing the identity of all cell phone users who happened to be in the vicinity of the crime scene." **Kurtz, supra** at 529-30. Further, the data "did not pinpoint [the defendant] to a specific building or location" but showed that his phone was within a range of distance during the time period in question.[8] **Id.** at 530. This Court observed that "[b]y their own terms, **Carpenter** and **Pacheco** were limited to CSLI data and forswore any application to tower dump requests." **Id.** Accordingly, this Court held that the appellant lacked a constitutionally protected privacy interest in the tower dump information. **Id.** at 531.

Instantly, the trial court found that Appellant lacked a reasonable

---

[8] More specifically, the **Kurtz** Court observed that the data provided by the defendant's cell provider did not pinpoint the defendant to a specific building or location, but showed only that his phone was within a range of up to seven and a half miles from the scene of the crime, located in a rural area. **Id.** at 530. This Court also noted that **Carpenter** had recognized that as the population density increases in more urbanized areas, the cell sector correspondingly shrinks and the CSLI becomes more focused and revealing of the target's exact location. **See id.** Notwithstanding these comments, this Court's holding with respect to a lack of reasonable expectation of privacy was not based on the type of population at issue in the area of the tower dump.

expectation of privacy in the data obtained from the tower dump.  The court reasoned:

> The ***Kurtz*** Court distinguished both ***Carpenter*** and ***Pacheco*** by noting that the logical foundation in extending Fourth Amendment privacy protection to CSLI is not present in a cell tower dump where the data produced does not reveal "a comprehensive chronicle of [an appellant's] physical movements," nor does it allow the government to track an appellant's "precise location and follow him continuously without detection."  Instead, law enforcement is merely able to "identify phones near one location…at one time."  ***Kurtz, supra***, at 530.  The Superior Court panel explained that tower dumps are less a tool for "tracking" suspects and more akin to the "conventional surveillance technique" of "security cameras," capturing the identity of all cell phone users who happened to be in the vicinity of a crime scene.  Moreover, the Court found that the data provided did not pinpoint the appellant to a specific building or location but instead only showed that his phone was within a range of up to seven and a half miles from the victim's home during the time period in question.
>
> In contrast to the cell tower located in a rural area in ***Kurtz***, in this case, the cell site that the three cell phones utilized was closer to the CVS.  However, as in ***Kurtz***, the data produced by T-Mobile did not reveal a comprehensive chronicle of Appellant's physical movements or track his precise location and follow him continuously without detection.

(Trial Court Opinion at 18-19).

We agree with the court's analysis.  Although Appellant attempts to distinguish this case from ***Kurtz*** by contending that the cell tower here was located in a densely populated urban area, and therefore, more focused than the data obtained in ***Kurtz***, the ***Kurtz*** Court's observation regarding population density was dicta.  This Court's analysis in ***Kurtz*** focused on the

location and time of the information obtained, as well as the fact that the data did not pinpoint the defendant's specific location but merely established that the defendant was utilizing a cell tower within a range of distance from the scene of the crime. Here, the tower dump placed Appellant and phone numbers he had contacted in the vicinity of the CVS store at the time of the robbery. As *Kurtz* remains controlling precedent, we agree with the trial court that Appellant lacked a reasonable expectation of privacy in the tower dump data to succeed on his suppression claim.[9] *See id.* Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/23/2024

---

[9] Further, we agree with the trial court's finding that the tower dump application constituted a search warrant supported by probable cause such that there was no violation of *Carpenter*. (*See* Findings of Fact and Conclusions of Law, 5/12/22, at 11-13). The court's order granting the tower dump application specified the place to be searched and the items to be seized with sufficient specificity. *See Green, supra*.