J-A14013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMAL TAHIM RORIE | : | |
| | : | |
| Appellant | : | No. 351 EDA 2023 |

Appeal from the Judgment of Sentence Entered October 14, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0000526-2020

BEFORE:  LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED DECEMBER 2, 2024**

Jamal Tahim Rorie appeals from the judgment of sentence, imposed in the Court of Common Pleas of Bucks County, following his conviction by a jury of robbery—threat of immediate serious bodily injury,[1] conspiracy (robbery),[2] burglary—not adapted for overnight accommodation,[3] conspiracy (burglary),[4]

---

[1] 18 Pa.C.S.A. § 3701(a)(1)(ii).

[2] *Id.* at § 903(a).

[3] *Id.* at § 3502(a)(3).

[4] *Id.* at § 903(a).

criminal trespass—entering a structure,[5] criminal use of a communication facility,[6] and false imprisonment.[7]  After careful review, we affirm.

The trial court set forth the underlying facts of this case as follows:

A multiple[-]defendant robbery occurred on June 10, 2019, at KVK Technology, Inc. (hereinafter[, KVK Tech]), a business that manufactures drugs, including Oxycodone, in Newtown, Bucks County, Pennsylvania.  A series of search warrants lodged led to the discovery that [Rorie's] cell phone was in or around the [KVK Tech] property during the June 10, 2019[] robbery.  His cell phone was also at or around the KVK Tech [p]roperty during a prior burglary and during prior criminal trespasses [there].

On May 27, 2019, from 3:00 a.m. to 3:52 a.m., and 6:18 p.m. to 8:57 p.m., [Rorie] and his girlfriend's [cell] phones were in Newtown, Pennsylvania. On that date, a Holy Family University security officer observed a black Hyundai four-door sedan on Campus Drive in Newtown in the late afternoon or early evening on Memorial Day.

The car parked for about ten minutes.  That area of Campus Drive is a road shared only by Holy Family University and KVK Tech. The University was closed and no one was permitted to be on the property without prior approval.

The security officer approached the car.  A male was seated in the driver['s] seat and a female was seated in the passenger seat. The security officer had observed [Rorie] using his [cell] phone. The vehicle returned to KVK Tech later that night around 8:27 p.m.  In [a] video, [Rorie], wearing a cat shirt and flowered pants, spent over two hours on his phone and wandering around KVK Tech, looking through windows, climbing the steps to the loading dock, trying to access the doors with sticks, and concealing himself and springing away when a security car drove around the back of the property.  [Rorie] was charged with crimes stemming

_____

[5] *Id.* at § 3503(a)(1)(i).

[6] *Id.* at § 7512(a).

[7] *Id.* at § 2903(a).

from these actions, however, the jury found him not guilty of said charges.

On May 30, 2019, at 12:52 a.m. and [on] May 31, 2019, at 10:39 p.m.[,] both [Rorie] and his girlfriend's phones were again in Newtown [in the vicinity of] KVK Tech.

On May 30, 2019, a video showed a dark car on KVK Tech property and three individuals walking in the back of the property along the windows heading toward the "paint room" (a room in the back of the property [that was] the entry point to KVK Tech for the June 10, 2019[] robbery[]).  The in[ternal] KVK [Tech] cameras videotaped two individuals walking through the paint room to the hallway and also captured them walking out of the building carrying brown cardboard boxes.  They moved toward an area where a chain-linked fence behind the KVK Tech property was later discovered to be newly [] cut.  During that break-in, one of the individuals wore a white hard hat backwards and a white face covering.  [Rorie] was also charged [with] these offenses, but the jury found him not guilty.

On June 1, 2019, between 2:16 a.m. and 5:33 a.m., [Rorie's] phone, his girlfriend's phone[,] and a co-conspirator's phone were being used [in the vicinity of] KVK Tech.  On that date, three individuals were videotaped traveling to the paint room/loading dock area at KVK Tech and then running behind KVK [Tech] property.  These individuals were seen [at] about 2:57 a.m. on a live video feed outside of the property by a KVK Tech security guard, who then called the police.

When Newtown Police Officer Francis Goodwin arrived in the area for the loitering call at KVK Tech, he noticed a suspicious car, a silver sedan, in the BB&T bank parking lot near KVK Tech.  The occupants, female driver Lashay Strickland ([whom] evidence [showed] was [Rorie's] girlfriend) and a male passenger[,] Juwan Carter (who[m Rorie] later admitted he knew)[,] told the officer that they were waiting for a friend at Homewood Suites, which was a couple miles away.  After the officer was finished investigating the radio call, at KVK Tech (he did not find anyone there), he went to the Homewood Suites to see if the vehicle from the stop at the BB&T bank had traveled there.

On the way [to the Homewood Suites], [Officer Goodwin] noticed three figures emerging from a construction site near the roadway. The individuals quickly turned around and ran.  After searching for those three people and not locating them, the officer proceeded

to the Homewood Suites and saw the silver sedan with the two occupants in it using their cell phones. He watched them for an hour, [after which] they drove off to Interstate 295. [Rorie] was found not guilty of conspiring to commit criminal trespass on this date.

[Rorie], however, was convicted of most of the offenses occurring on June 10, 2019. On that date, [Rorie's] phone and an unknown phone traveled from Philadelphia to Newtown [around] 2:26 a.m. and made several calls[,] until 3:42 a.m.[,] near KVK Tech.

The most frequent place [Rorie's] phone, his girlfriend's phone, and the other two conspirators' phones were normally used was Philadelphia.

On [June 10, 2019], at around 4:25 a.m., KVK [Tech] security guard Jessica Ringer was working when she saw two people on the security cameras in the loading dock area inside the building. She explained that the building was under construction, and there were mainly boxes and drug labels in the building. Only people who possessed badges were supposed to be in the building. She thought the two people she viewed were employees picking up boxes or contractors working early. Because the two individuals seemed like they were searching for something, she grabbed her radio and went to help them.

She first encountered a taller man wearing a hard hat. She was about to ask him if he needed any help when a man with a black ski mask came out from behind him. She was very scared and knew they were there to rob the place. They took her security walkie-talkie radio, asked if she had a panic button or cell phone, and repeatedly asked where the drugs were, gesturing at the boxes in the room. She told them there were no drugs there, just boxes with drug labels. They pushed her into the back corner of the loading dock office, facing the wall, and told her to "wait 20 minutes. We have to get out." "[I]f you turn around before the 20 minutes are up, we'll shoot you." She was terrified and believed they had firearms.

After police arrived for the robbery call and were investigating the area outside the building, they noticed that a hole had been cut in the black chain-link fence that separated KVK [Tech] from the field behind it; the grass right inside the hole in the fence was matted. A [police] K-9 tracked through the fence and behind the property. A white dust mask was found in the field behind KVK Tech[,] as well as several cardboard boxes with a white label [reading] "KVK

Tech, Inc." and [a] blue label [reading] "Oxycodone, Acetaminophen tablets." At least one box was opened. [Rorie] appeared to be wearing a white mask in the still pictures and video.

When police returned to the KVK Tech building, they were shown pallets of boxes that were approximately ten feet off the ground. The plastic wrapping around the boxes had been ripped open and several boxes were missing from the pallets. The boxes were similar to the labeled boxes found in the field.

Detective [Daniel] Bartle collected a white hard hat that had distinctive writing on it (identical to the hard had in the surveillance video he viewed) in the KVK Tech. "paint room[.]" The hard hat had been placed on top of items in the room. The door to the paint room that led outside could close but did not lock; the door could also be pulled open from the outside of the building. A walkie-talkie was found next to the hard hat and tagged as evidence.

After watching the video and seeing that [Rorie] was wearing the white hard hat backwards with the back strap to his forehead, Detective Bartle collected the hard hat as evidence, swabbed the back strap for DNA, and that swab[,] as well as other samples collected[,] were sen[t] to the Pennsylvania State Police [PSP] lab for testing.

Also, after Detective Bartle watched the video of the robbery, the other suspect[,] who was wearing a black hood/ski mask[,] appeared to be on a cell phone for the majority of the time inside the loading dock, in excess of forty (40) minutes. Seach warrants were executed for the nearby cell phone towers. A "target number" associated with [Rorie] and an unidentified coconspirator['s] number were linked to an over forty-minute cell phone call near KVK Tech.

* * *

[On September 12, 2019, Rorie was interrogated by Northampton Township Detectives Bartle and Christopher Bush. Rorie was first advised of his **Miranda**[8] rights, acknowledged and executed a

_____

[8] **Miranda v. Arizona**, 384 U.S. 436 (1966).

- 5 -

written waiver of those rights, and ultimately agreed to allow Detective Bartle to conduct a buccal swab for DNA purposes.[9]].

Following a jury trial from June 21 to 27, 2022, [Rorie] was found guilty of [the above-mentioned offenses] related to the June 10, 2019 [] break-in to KVK Tech. [Rorie] was found not guilty of other charged burglary, criminal trespass, and related offenses [that] occurred on May 27, 2019, May 30, 2019, and June 1, 2019.

On October 14, 2022, [Rorie] was sentenced on the lead robbery conviction to seven (7) to fourteen (14) years['] incarceration. No further penalty was imposed on the remaining convictions.

Supplemental Trial Court Opinion, 11/3/23, at 1-12 (footnotes and internal citations omitted). On October 24, 2022, Rorie filed post-sentence motions raising sufficiency and weight of the evidence issues as well as a discretionary aspects of sentencing claim. The court denied the motions on December 29, 2022.

Rorie filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. On February 16, 2023, Rorie filed a motion for an extension of time to file his Rule 1925(b) statement once all necessary notes of testimony had been transcribed for counsel's review. The court granted the extension on February 23, 2023. On April 14, 2023, Rorie filed his Rule 1925(b) statement, which consisted of 15 issues and 36 sub-issues. On May 10, 2023, the trial court filed a Rule 1925(a) opinion.[10]

---

[9] *See* Commonwealth Exhibit CS-36.

[10] On May 22, 2023, Rorie filed a "Motion to Vacate Briefing Schedule and Remand for the Filing of an Amended Concise Statement of Matters Complained of on Appeal." In response, on June 6, 2023, our Court issued an order vacating the briefing schedule, remanding the matter to the trial court
*(Footnote Continued Next Page)*

On July 6, 2023, after receiving requested notes of testimony, Rorie filed a supplemental Rule 1925(b) statement raising 13 new issues, two new sub-issues and six new sub-sub-issues. On November 3, 2023, the trial court flied a supplemental Rule 1925(a) opinion.

On appeal, Rorie raises the following issues for our consideration:

(1)     Did the trial court err in denying [Rorie's m]otion to [s]uppress evidence obtained as a result of the search warrant?

(2)     Did the trial court err in denying [Rorie's m]otion to [s]uppress his statements where [Rorie] invoked his right to an attorney pursuant to *Miranda v. Arizona*?

(3)     Did the trial court err in denying [Rorie's m]otion to [s]uppress his statements made in violation of his right to counsel pursuant to the Sixth Amendment to the [Constitution of the] United States of America?

(4)     Did the trial court err in denying [Rorie's m]otion to [s]uppress, where the arrest was not supported by probable cause?

Appellant's Brief, at 4.

Cell Phone Tower Location Information

Rorie first argues that the four "tower dump" warrants issued in this case were overbroad and lacking in particularity because they failed to identify the persons or things to be seized. *Id.* at 18, 23. To support his argument, Rorie relies upon *Carpenter v. United States*, 585 U.S. 296 (2018), where

_____

for 90 days, directing Rorie to file a supplemental Rule 1925(b) statement in the trial court, and directing the trial court to file a supplemental Rule 1925(a) opinion, if necessary. *See* Order, 6/6/23.

the Supreme Court of the United States was asked to determine whether a defendant has a reasonable expectation of privacy in the time-stamped record of his or her cell phone, otherwise known as cell-site location information (CSLI), maintained by a third-party. In *Carpenter*, third-party wireless carriers produced CSLI for the defendant's phone to the government, allowing it to catalog the defendant's movements over 127 days. On appeal, the Court held: (a) the government's acquisition of the defendant's CSLI is a Fourth Amendment search and (2) the government needed to obtain a warrant, based upon probable cause, to access the CSLI, not merely show "reasonable grounds" under the Stored Communications Act. *Id.* at 316-20.

Following *Carpenter*, the Pennsylvania Supreme Court, in *Commonwealth v. Pacheco*, 263 A.3d 626 (Pa. 2021), decided whether the collection of "real-time" CLSI was also a search under the Fourth Amendment due to its intrusion into a person's privacy. In extending the *Carpenter* holding to that case, our Supreme Court held that "because [the defendant] had a legitimate expectation of privacy in his continuous real-time CSLI, the *Carpenter* rationale requiring a warrant for the collection of historical[11] CSLI

_____

[11] Real-time CSLI is

> obtained when the wireless service provider sends a command signal to the targeted cell phone to activate the phone's location subsystem and then provides the current location of the phone to law enforcement, [whereas] historical CSLI is automatically generated and routinely collected by wireless service providers each time a cell phone connects to a cell tower.

*(Footnote Continued Next Page)*

applies with equal force here." ***Id.*** at 652. In particular, the ***Pacheco*** Court upheld the search of the defendant's CSLI evidence as constitutional because the orders authorizing the collection of defendant's real-time CSLI evidence, issued pursuant to the Wiretapping and Electronic Surveillance Act, "served as the functional equivalent of a warrant." ***Id.***

> When reviewing an order denying a motion to suppress, our review:
>
> is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

***Commonwealth v. Ford***, 175 A.3d 985, 989 (Pa. Super. 2017).

"A defendant moving to suppress evidence has the preliminary burden of establishing standing and a legitimate expectation of privacy." ***Commonwealth v. Burton***, 973 A.2d 428, 435 (Pa. Super. 2009) (en banc).

> Standing requires a defendant to demonstrate one of the following: (1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence

---

***Pacheco***, 263 A.3d at 635 n.9.

improperly seized; (3) that the offense charged includes as an essential element the element of possession; or (4) a proprietary or possessory interest in the searched premises. A defendant must separately establish a legitimate expectation of privacy in the area searched or thing seized. Whether [a] defendant has a legitimate expectation of privacy is a component of the merits analysis of the suppression motion. The determination [of] whether [a] defendant has met this burden is made upon evaluation of the evidence presented by the Commonwealth and the defendant.

*Id.* (citations omitted).

"[W]hen law enforcement requests a tower dump, [like in the instant case,] it identifies a specific location and specific time period[.]" ***Commonwealth v. Kurtz***, 294 A.3d 509, 528 (Pa. Super. 2023), *appeal granted*, 306 A.3d 1287 (Pa. 2023).[12] Additionally, "the service provider determines 'what cell towers would reasonably service' the location and compiles a record that 'show[s] all of the subscribers that initiated communications across those towers in that area for the time span covered.'" *Id.* Further,

[t]he information that is produced in a tower dump is automatically generated and routinely collected by the service provider. [U]nlike CSLI, a tower dump does not allow for the tracking of the movement of any individual cell-phone user[,] but simply indicates all of the usage in a particular location during a particular time period.

*Id.*

---

[12] On October 30, 2023, our Supreme Court granted Kurtz's petition for allowance of appeal on two issues, neither of which are related to the cell tower dump warrant. ***See Kurtz***, 306 A.3d at 1287.

- 10 -

In **Kurtz**, one of the issues the defendant raised on appeal was whether the trial court should have suppressed evidence, gathered through a "tower dump" request to AT&T, that showed all of the cellular devices connected to the service-provider's antenna servicing the vicinity of the victim's residence during the hours she was attacked. **Id.** at 528. The defendant's claim was premised on privacy concerns as well as the fact that the relevant warrant issued lacked probable cause and specificity regarding the individual involved, the place to be searched, and the items to be seized. **Id.** In holding that the defendant had not established a legitimate expectation of privacy concerning the information produced by the service provider, AT&T, the Court stated that "the logical foundation in **Carpenter** and **Pacheco** extending Fourth Amendment privacy protection to CSLI is not present here." **Id.** at 530 (citing **Pacheco**, 263 A.3d at 641). The Court concluded that "the data produced by AT&T did not reveal 'a comprehensive chronicle of [the defendant's] physical movements,' [n]or did it allow the government to track [the defendant's] 'precise location and follow him continuously without detection.'" **Id.**

Similar to the facts in **Kurtz**, here, law enforcement was only able to identify phones near **one location**—the three closest cell towers to the KVK Tech property—at **one time**—between the hours of 3:28 a.m. and 5:00 a.m.—on **one day**—June 10, 2019. The data given by the cell phone providers did not pinpoint Rorie to a specific building or location, but instead only showed that his cell phone was within the vicinity of the relevant cell towers at the time of the crimes at issue. The information that the Commonwealth

specifically sought from these service providers included the date, time, and subscriber information for calls and text messages handled by those cell towers. Under these circumstances, we conclude that Rorie lacked a reasonable expectation of privacy concerning the information produced by AT&T, Verizon Wireless, T-Mobile, and Sprint. The Fourth Amendment privacy protections afforded in CSLI cases is not applicable here where the information from the service providers did not track Rorie's physical movements, his precise location(s), or follow him continuously. Having failed to demonstrate that he had a reasonable expectation of privacy in the cell-phone dump tower information, the trial court properly denied Rorie's motion to suppress on this basis.

Cellular Phone Records/Specific Phone Numbers

As a result of the information obtained from the cell-tower dump warrants, the Commonwealth obtained eight additional search warrants that requested subscriber information and records of phone numbers that were determined to be in the vicinity of the burglary at the time of the crime. The Commonwealth also applied for another search warrant for telephone number 215 -*51-2*24. Rorie challenges each of these subsequent search warrants because they rely on the information received from the allegedly unconstitutional tower dump warrants to establish probable cause. Having

already determined that the four cell-tower dump warrants pass constitutional muster, we conclude that this derivative issue is also meritless.[13]

DNA Sample

Rorie next argues that the trial court erred in denying his motion to suppress a September 14, 2019 search warrant that sought buccal swabs (DNA collection) from him for analysis and comparison purposes because "the [a]ffidavit of [p]robable [c]ause in support of the search warrant contained a material misstatement." Appellant's Brief, at 30. Specifically, Rorie argues that information in the buccal swab search warrant's affidavit stating that DNA found on a hard hat discovered at the crime scene was a "partial match to [Rorie's] DNA profile" is materially false. **Id.** at 31.[14]

"[I]f a search warrant is based upon an affidavit containing deliberate or material misstatements, the search warrant is invalid." **Commonwealth v. Antoszyk**, 985 A.2d 975, 981 (Pa. Super. 2009), *aff'd by divided court*, 38

_____

[13] Rorie relies on **Commonwealth v. Knowles**, 327 A.2d 19 (Pa. 1974), to support his argument that the eight additional search warrants were not supported by probable cause. **Knowles** discusses the doctrine known as "fruit of the poisonous tree." **Id.** at 24. Specifically, that theory presupposes that the information in the eight warrants was tainted from the initial illegal warrant. Again, having concluded that the tower dump warrant was legal and did not lack probable cause, this theory fails.

[14] In his motion to suppress, Rorie alleges, among many other things, that the affidavit of probable cause "[m]isrepresent[s] the PSP Report on various averments[,] including[,] but not limited[,] to the strength [of and] exaggerate[ion of] the identity [of] other possible contributors of DNA evidence when it stated . . . [t]hat [the] partial DNA profile . . . identified the profile as belonging to [] Rorie[.]" Motion to Suppress, 3/16/21, at ¶ v.

A.3d 816 (Pa. 2012). However, "misstatements of fact will invalidate a search warrant and require suppression of the fruits of the search *only if the misstatements of fact are deliberate and material*." **Commonwealth v. Baker**, 24 A.3d 1006, 1017 (Pa. Super. 2011) (emphasis in original). A defendant must preliminarily show that the affiant knew the information or statement was false and deliberately included it in his or her application, or "that [the affiant] included it in reckless disregard for whether it was true or false." **Commonwealth v. Iannaccio**, 480 A.2d 966, 972 (Pa. 1984) (opinion in support of affirmance); *see also* **Commonwealth v. Simmons**, 237 A.3d 430 (Pa. Super. 2020) (Table).[15] Finally, a trial court determines whether a misstatement was deliberately made. **Id.**

Here, the relevant language of the report states:

4[.] A partial DNA profile from an unidentified individual, consistent with a male, was obtained from:

The swab of the hard hat (Item Q4).

\* \* \*

5[.] A DNA profile obtained from the swab of the strap of the hard hat (Item Q4) has been uploaded into the Combined DNA Index System (CODIS) at the State (SDIS) level and searched.

As a result of a CODIS search, an individual cannot be eliminated as a possible investigative lead to the unidentified profile obtained from this item.

---

[15] **See** Pa.R.A.P. 126(b)(2) (non-precedential decisions filed after May 1, 2019, may be cited for persuasive value).

- 14 -

Name:  Jamal Bentley AKA Jamal Rorie

\*    \*    \*

This report is considered a preliminary report **and may be used as probable cause to obtain a search warrant for an appropriate reference sample from the individual.  In order to issue a final report for the comparison of the profile of the individual to the questioned sample(s), a blood sample . . . or a buccal collector from the above[-]listed individual shall be submitted to the laboratory.**

PSP Bureau of Forensic Services DNA Lab Report, 8/13/19, at ¶¶ 4-5 (emphasis added).  The relevant language of the affidavit of probable cause states:

9. From the video footage, [i]nvestigators know that the males fled from KVK Tech[] through the same "paint room," at approximately 04:30hrs.  During a search of the crime scene, your affiant recovered physical evidence, including a **white colored construction hard hat with unique markings, matching those seen on the hard had being worn by one of the male suspects.**

10.  That hard hat was later processed by your affiant for forensic evidence, which was submitted to the [PSP] – Bureau of Forensic Services for DNA analysis.  On 08/13/2019, your affiant learned **that the analysis resulted in partial DNA profile being identified.  That partial DNA profile** was uploaded to the Combined DNA Index System (CODIS), which **identified the partial profile as matching the DNA profile of** [] **Rorie (also known as Jamal Bentley)[.]**

Application for Search Warrant, 9/14/19, at ¶¶ 9-10 (emphasis added).

Rorie points to Detective Bartle's testimony where he stated that he "interpreted [the DNA analysis report] as a partial match" even though "the report says ["]potentially from["].  N.T. Pretrial Motions Hearing, 3/31/21, at 111.

- 15 -

Instantly, the trial court found credible Detective Bartle's testimony that his representation on the affidavit was neither intentional nor deliberate, but merely a layperson's interpretation of a DNA analysis report. **Baker**, **supra**. The fact that Detective Bartle made the statement unintentionally is further supported by the fact that the DNA report, itself, states that it *may* be used as probable cause to support a search warrant for a DNA sample from Rorie. As such, we conclude that the trial court correctly denied suppression of the evidence seized from execution of the DNA warrant. **See Commonwealth v. Leeds**, 186 A.3d 405, 415 (Pa. 2018) (courts "must read probable cause affidavits in a commonsense fashion to ascertain whether probable cause exists").

Fifth Amendment/**Miranda**

Rorie next contends that the trial court improperly failed to suppress statements he made after he was advised of his **Miranda** rights, acknowledged those rights, and executed a written waiver. Rorie specifically claims that he invoked his right to an attorney several times after he executed the waiver. **See** Appellant's Brief, at 36-38. Despite this invocation, Rorie asserts that the police "continued to initiate other types of contact . . . which resulted in [Rorie] making a number of incriminat[ing] statements." **Id.** at 38.

It is well-established that "after initially being advised of his **Miranda** rights, the accused may himself validly waive his rights and respond to interrogation." **Edwards v. Arizona**, 451 U.S. 477, 484 (1981). "If an

individual 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease,' and any statement taken after the person invokes his privilege 'cannot be other than the product of compulsion, subtle or otherwise.'" *Miranda*, 384 U.S. at 473-74. Further, "if the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474. However, there is no rule that requires law enforcement to ask clarifying questions if a defendant makes ambiguous or equivocal references to an attorney. *Id.* at 461-62.

In *Commonwealth v. Frein*, 206 A.3d 1049 (Pa. 2019), our Supreme Court acknowledged:

> In *Davis v. United States*, 512 U.S. 452 [] (1994), the United States Supreme Court explained that, when invoking a right to counsel under *Miranda*, a suspect must do so unambiguously. *Id.* at 459. If a suspect makes a statement regarding the right to counsel that is ambiguous or equivocal, the police are not required to end the interrogation, nor are they required to ask questions designed to clarify whether the suspect is invoking his *Miranda* rights. *Id.* at 461-62. In *Davis*, the Court concluded that the suspect's statement, "Maybe I should talk to a lawyer," was not a request for counsel, and, therefore, law enforcement agents were not required to cease questioning. *Id.* at 462.

*Frein*, 206 A.3d at 1065.

After reviewing the audio/video recordings of Rorie speaking with Detectives Bartle and Bush, the trial court found that there were "no coercive interrogation methods or techniques" used by the detectives, that Rorie never requested an attorney or stated that he did not wish to speak to the police,

- 17 -

and that "Rorie's statements to police on September 12, 2019[,] were voluntary and not the product of any unlawful or improper police actions." Trial Court Opinion, 5/10/23, at 35.

We have reviewed the audio video recording of the detectives' interview with Rorie. **See** Exhibit CS-36, at 12:42-12:44. In particular, we watched and listened to those specific portions of the recorded interview in which Rorie alleges he "indicated his desire to consult with an attorney." Appellant's Brief, at 36 ("Specifically, at 41 minutes and 49 seconds[,] . . . 42 minutes and 25 seconds[,] . . . and 43 minutes and 49 seconds into the interrogation" Rorie indicates he wants to talk to lawyer). At none of these times does Rorie express any desire to speak to a lawyer or invoke his right to counsel. Rather, he consistently indicates that he has no problem talking to the detectives or with them obtaining a buccal swab of his cheeks for DNA. Because there is no unambiguous indication, on the record, that Rorie told law enforcement that he wished to speak to an attorney, after validly executing his **Miranda** rights, he is entitled to no relief. **Frein**, **supra**.[16]

Sixth Amendment Right to Counsel

Rorie next claims that, based on his Sixth Amendment right to counsel, the court should have suppressed statements he made to law enforcement where "he indicated his desire to consult with an attorney on several occasions." Appellant's Brief, at 38-39. Rorie claims that where police

_____

[16] Any reference that Rorie made to an attorney was not related to the interrogation, but concerned reviewing the search warrant for his DNA.

"deliberately elicited inculpatory information from him," his Sixth Amendment rights were violated because he had been arrested, did not have counsel present, and did not waive his right to counsel. *Id.* at 44.

"The right to counsel under the Sixth Amendment[,] made applicable to the States under the Fourteenth Amendment[,] goes beyond [Fifth Amendment rights that] protect[] the defendant against self-incrimination during custodial interrogation." *Commonwealth v. Karash*, 518 A.2d 537, 540 (Pa. 1986). "The Sixth Amendment provides that 'in all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defense.'" *Commonwealth v. Hayes*, 755 A.2d 27, 31 (Pa. Super. 2000). Thus, a waiver under *Miranda* does not necessarily translate to a waiver of the right to counsel under the Sixth Amendment. *Karash*, *supra* at 540.

Our Courts have held that "the Sixth Amendment right to counsel [attaches at] the initiation of adversary judicial proceedings," which is generally the arraignment. *Commonwealth v. Gwynn*, 943 A.2d 940, 947 (Pa. 2008). *Commonwealth v. Arroyo*, 723 A.3d 162, 166 (Pa. 1999) (citation omitted). ("[A] suspect has no Sixth Amendment right to counsel until the first formal charging proceeding has transpired, and it can be said that the formal initiation of adversarial judicial proceedings has occurred."). In *Commonwealth v. McCoy*, 975 A.2d 586 (Pa. 2009), our Supreme Court announced:

> A criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the right to counsel under the Sixth Amendment, U.S. Const. amend. VI. The initiation of adversary proceedings can be via formal charge, preliminary hearing, indictment, information, or arraignment.

*Id.* at 590.

Rorie complains that following his initial interrogation by Detectives Bartle and Bush, Rorie "initiated conversation [and] requested to see a photograph of an individual the police had previously asked him about." Appellant's Brief, at 39. Rorie claims that Detective Bartle then showed him a photograph of Juwan Carter and began to question him regarding [] Carter." *Id.* Rorie asserts that, at that point, the police told him they possessed DNA evidence that linked Rorie to the hard hat found at KVK Tech. *Id.* In response, Rorie states that he told them, "there is no way you have my DNA because I had [a] hat on." *Id.* Then, according to Rorie, after he invoked his right to counsel, "he was asked numerous times for the name of a particular individual." *Id.*

First, Rorie cites the same parts of the interview with Detectives Bartle and Bush that he did for his Fifth Amendment claim to support his argument that he asked for an attorney after executing a *Miranda* waiver. However, as we concluded *infra* at 18, "[a]t none of these times does Rorie express any desire to speak to a lawyer or invoke his right to counsel." Second, Rorie claims that at the time of this questioning, "[i]t is undisputed that [he] had

- 20 -

been arrested and was being interrogated after his arrest." *Id.* at 41. However, the record belies this claim as well.

The fact that Rorie was in custody throughout the period in question "is not in and of itself determinative" of whether his Sixth Amendment right to counsel attached under these facts. *Karash*, *supra* at 540. By way of example, in *McCoy*, although the defendant was under arrest for DUI, because no criminal complaint had yet been filed, the Court found that the "adversarial judicial proceedings" had not yet begun. *Id.*, 975 A.2d at 590. The Court noted that any "tactical advice counsel may have been able to provide" the defendant at that stage was "irrelevant [because] . . . this was not a 'critical stage' under our jurisprudence" such that the constitutional right attached. *Id.*

Instantly, Rorie had not yet been arraigned at the time of the instant questioning. More specifically, the final steps in the arrest process had not yet even taken place. *See* Exhibit CS-36 at 12:44:50-12:45:02 (when asked if he was "going to jail right now," Detective Bartle stated "no" and explained that, after interrogation concludes, they are going to get camera and take pictures of him, then Rorie will get fingerprinted and photographed for processing "for his arrest," and then is going to see judge who will set bail). Because no adversarial judicial proceedings had yet occurred in his case, the Rorie's Sixth Amendment right to counsel had not yet attached. Thus, we find no merit to this claim. *Gwynn*, *supra*; *McCoy*, *supra*; *Arroyo*, *supra*.

Arrest/Probable Cause

In his final issue, Rorie argues that the affidavit supporting the search warrant in the instant case lacked probable cause where it "relies almost exclusively on the information received as a result of the search warrants discussed at length above." Appellant's Brief, at 47. Having concluded that the other search warrants challenged on appeal were not illegal or lacking in probable cause, we find no merit to this claim.

Judgment of sentence affirmed.

Lane, J., Joins the Memorandum.

Stabile, J., Concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2024